JOHN E. MITCHELL v. H. E. SHERRELL, et al.

Middle Section. December 23, 1929.

Petition for Certiorari denied by Supreme Court, April 5, 1930.

Ira Stevens, of Fayetteville, and Joseph C. Higgins, of Nashville, for appellant.

W. B. Lamb, Jr., of Fayetteville, for appellee.

DeWITT, J.  Complainant John E. Mitchell, a negro, owned a tract of 65 acres of land which was encumbered by a mortgage to secure a debt of nearly $800 which he owed to B. C. Wallace.  He also owed a debt of about $125 to D. C. Sherrell Company, a mercantile partnership, of which H. E. Sherrell was a member.  Wallace's note being overdue, he caused the land to be advertised for sale under foreclosure.  Mitchell persuaded H. E. Sherrell to pay the Wallace note upon his taking a new mortgage to secure the loan and also the note held by D. C. Sherrell Company.  Sherrell was moved by a desire to secure the payment of this note, as Mitchell was apparently unable otherwise to secure or pay it.  On July 31, 1925, Mitchell and his wife signed and acknowledged the execution of a mortgage to secure payment of their note to H. E. Sherrell for $1500, due September 1, 1925.  On August 1, 1925, Mitchell executed a mortgage to H. E. Sherrell and D. C. Sherrell Company conveying, as recited, "all of my crop of corn, estimated at 15 acres, and also all of my crop of cotton, estimated at 30 acres, planted and to be planted, cultivated and stored the present year on Joe Smith's and my tracts of land in the 18th Civil District of Lincoln County." In this instrument it was recited:

"Whereas, I am indebted to H. E. Sherrell by note for $1500 and to D. C. Sherrell Company by note for 'approximately $125,' and D. C. Sherrell Company agree to sell and deliver to me goods, wares, merchandise, supplies, etc., during the present year to the amount of $200, should I desire to do so, and I execute this paper to secure the payment of said amount and any further sums they may furnish me.  If I pay off said account and notes and expenses of this trust by October 15, 1925, this paper shall be void, if not so paid, said H. E. Sherrell and D. C. Sherrell Company or agent shall sell the crop produced on said land or a sufficiency thereof, publicly or privately, for cash and apply proceeds,

"First, to the expenses of this trust, secondly, to said account and notes, the surplus, if any, will be delivered up or paid over to the maker hereof.  H. E. Sherrell and D. C. Sherrell Company, or agent, may take possession of said crops and at any time, if

necessary, to secure the same for the purpose of this trust, and to do whatever is necessary to secure the payment of the aforesaid amounts.''

The explanation of the short period provided for payment given is that it was contemplated that Mitchell would secure a Federal Land Bank loan and pay the debts, but this was not accomplished.

No further monies were advanced or goods furnished by Sherrell to Mitchell, but the explanation given by H. E. Sherrell is that it was thoroughly understood between him and Mitchell that the latter was to pay just what he owed and no more, regardless of the amount of the note given.; that his purpose in taking the chattel mortgage was to be thoroughly protected, as Mitchell owed money to other people; that he knew that Mitchell could not obtain from the Federal Land Bank sufficient money to pay these debts; and that the crops, together with the money derived from such loan, would discharge the debts. These statements are not denied by Mitchell, except that he testified that he did not know that the mortgages were to secure a note for as much as $1500.

Mitchell did not account for these 1925 crops and the mortgage thereon availed nothing. In the autumn of 1925 H. E. Sherrell advertised the land for sale under a power of sale given in the mortgage. Upon the request of Mitchell for additional time, and upon his representation that he would get the money and pay him, Sherrell refrained from making the sale.

In the early spring of 1926 Mr. Sherrell discovered that Mitchell had left the place. He thereupon took possession and rented the land to one Holman. No rents were received prior to a sale under foreclosure which took place on September 8, 1926. At said sale H. E. Sherrell became the purchaser upon his bid of $800. It was provided in the mortgage: ''Said H. E. Sherrell is authorized to bid on and to purchase said land at such sale as if he were. disinterested, and is authorized to execute, proper deed or deeds to the purchasers, conveying said land to the purchaser or purchasers, at such sale.'' Mr. Sherrell, as mortgagee, executed a deed purporting to convey the land to himself.

On November 2, 1927, Mitchell and his wife filed the bill in this cause in ignorance of the said foreclosure. They alleged that the mortgages were given for an amount largely in excess of the indebtedness due, which they stated to be not over $870; that the tenants of the land for 1926-1927 were one Holman and one Rollins; that H. E. Sherrell had caused said tenants to attorn to him; that while said tenants were thus in possession the farm had been damaged. They prayed for an accounting, for an adjudication that the mortgage in excess of the amount shown to be due was void, for damages,

and for rents for 1926 and 1927, at $200 a year, to be credited on the actual debt. The bill was filled against H. E. Sherrell individually and Mrs. D. C. Sherrell and H. E. Sherrell as composing the partnership of D. C. Sherrell Company.

Defendants denied any liability to complainants and denied especially an averment in the bill that H. E. Sherrell ever represented to Mitchell that the mortgage recited that it was to secure only the amount paid to satisfy the Wallace debt and the note due D. C. Sherrell Company. They set forth the foreclosure and claimed title to the land thereunder, from September 8, 1926.

The complainants thereupon filed a supplemental bill alleging that the property was not advertised by H. E. Sherrell and that the sum of $800, as set out in the deed, was far below a just and fair price for the land. They prayed that the deed be declared void and cancelled; that a sale of the land be made under orders of the Chancery Court; that the proceeds thereof be applied, first, to the payment of what amount the complainants legally and justly owe the defendants; that the balance be applied by being paid over to complainants.

The allegations of this supplemental bill were traversed by defendants in an answer. Much testimony was taken and upon the hearing the Chancellor dismissed the original and supplemental bills. The complainants appealed. The assignments of error involve five propositions, as follows:

1. That the sale of the land was not advertised according to the provisions of the mortgage.

2. That the land was worth approximately $1800; and that the sum of $800 paid for it by the appellee was so inadequate that the Court should have set the sale aside and ordered a re-sale.

3. That the Court should have treated the mortgagee as a quasi-trustee of complainants and under obligation to make the land bring a fair price, and to refrain from buying it except at a fair valuation.

4. That as a condition precedent to a valid foreclosure, Sherrell, as mortgagee, should have had an accounting with the mortgagors.

5. That the Court should have awarded as rents approximately $200 and as damages for waste $100 to $150.

As to the advertisement and sale the provision in the mortgage is as follows:

"But if we should fail to pay off said note and expenses at maturity, then said H. E. Sherrell, after advertising time, terms and place of sale for ten days by written hand bills posted up at three public places in the 18th Civil District of Lincoln County, Tennessee, shall sell said tract or parcel of land in the town of Fayetteville, Tenn., to the highest bidder for cash, free from homestead and dower rights, rights of redemption, homestead and dower rights, and all being hereby waived and cut off,"

It appears that the typewritten hand bills prepared by Mr. Sherrell and alleged to have been duly posted set forth the time, terms and place of sale. The insistence is made that they were not posted at three public places in the 18th Civil District of Lincoln County. The evidence compels the inference that this district contains only one village, called Blanche, having only one store. This is about a mile from the land involved. No advertisement of this sale was posted at Blanche. But it appears that Mr. Sherrell prepared a dozen or more·of these handbills, gave them to Gordon Holman with instruction to post them in the district; that John Lawson Sherrell furnished him with tacks for this purpose. This was done twenty, instead of ten days before the sale. Holman testified that he posted three of these advertisements on the farm itself, one at the old Baptist Church, one at the crossing of the Pulaski and Huntsville Pike, ·and the Ardmore and Fayetteville Road, another at the fork of two roads; and that another was posted at the fork of two roads at the home of one Joe Smith. A witness, Tuck Hunt, testified that he was with Holman when he posted three of the advertisements on the place to be sold, two on the front of the house and one on a tree in the front yard, a road passing in front of the place; also that he saw Holman post one on a mail box. Mrs. Holman testified that in September, 1926, she saw one of the advertisements tacked on a post "down there on the State line at a corner." John White testified that it was common neighborhood talk and gossip in that vicinity in the year 1926 that the property was to be sold under Mr. Sherrell's mortgage. This testimony is positive, while that adduced by the complainants is largely negative, that is, the witnesses testified that they never saw nor heard of the advertisements. The complainants stand upon the proposition that the burden was upon Sherrell to prove compliance with the provisions of the power of sale and that he has not carried the burden. But the deed executed by H. E. Sherrell, as mortgagee, to himself shows full compliance with the power, terms and directions of sale, and this is prima-facie evidence as against the complainants that the directions of the mortgage were followed. Rucker v. Hyde, 118 Tenn., 358, 100 S. W., 739. The defendants, however, have sought to prove due compliance without relying on a presumption. We find that they have done so. By the weight of the evidence it appears that the advertisement was posted at a church, at the. crossing of two principal highways, at the forks of roads, and on the land in full view from a public road.

The selection of the "public places" was left to the mortgagee, but it was necessary that the places chosen be such as to give reasonable publicity to the notices. 41 C. J., 964. Whatever answers this·

condition, under the circumstances, would fulfill the requirement. In Austin v. Soule, 36 Vt., 345, it was aptly said:

"The term 'Public place' is to be interpreted in a relative rather than in an absolute sense, and must be 'defined by reference to the circumstances and the subject-matter of each particular case. We call that public which is open for general or common use or entertainment, as a public highway or road, or a public house.' "

A public place is a place where all persons have a right to go and be. It is distinguished from a private place in that it is a place that is visited by many persons and is usually accessible to the neighboring public. 32 Cyc., 1249. A church is prima facie a public place for the posting of a notice. Scammon v. Scammon, 28 N. H., 419. Certainly the crossing of two principal highways is a public place, and so is the fork of public roads. The test is whether or not the public might see the notice; and even the notices on the house and on a tree in the yard abutting on a public road may be deemed to have been in a public place under such a test, for they might attract the attention of persons traveling along the road.

We therefore find that the advertisements of sale were posted in more than three public places in the district and for the time provided in the mortgage.

As to the right to foreclose without having an accounting:

The debt for which foreclosure was made was the Wallace debt, $770 and interest, and the Sherrell note, $101.86, dated January 1, 1923, and interest. Mr. Sherrell paid to Wallace $794.50 on August 1, 1925. Mitchell knew that he owed these debts and that the mortgage was given to secure them. He knew that they were overdue and he requested further delay. He made no tender of any amount. If he is not entitled to rents or damages, the amount of the debt was easily ascertainable.

Some good reason must always be shown to justify an interference with the sale. Terry v. Furth, 40 Wash., 493, 82 Pac., 882. In 41 C. J., 933 the rules are stated as follows:

"A sale under the power may be enjoined where it appears that the amount of the debt is unliquidated, uncertain, or only capable of ascertainment on a detailed and complicated accounting. On the other hand, an injunction suit cannot be maintained where the amount of deduction for partial failure of consideration is trifling, or where the amount due is easily ascertained by deducting the disputed items, and it appears that the bill is interposed for delay."

No fraud or usurious charge is shown in the record before us. The failure of Sherrell to state to Mitchell the precise amount of the debt is not shown to have affected Mitchell's ability to pay the debt.

The account is not complicated if no rents or damages are to be awarded. We are of the opinion that complainants' would not have been entitled to an injunction restraining the sale on this ground; and this is the test of a right to set aside the sale. It is proper here to state that H. E. Sherrell made an effort to notify Mitchell of the contemplated foreclosure; that he was unable to find him; that he sent him a notice by mail to his last known address, and it was not returned to him.

The claims for rents and damages are predicated upon the claim that H. E. Sherrell wrongfully took possession of the premises in the Spring of 1926. Mr. Sherrell testified that in the early Spring of 1926 he learned that Mitchell had left the place, and so far as he could learn, it was "lying vacant;" that he got Gordon Holman and Tuck Hunt to live on it and cultivate a part of it; that he received no rents prior to the sale on September 8, 1926. John Mitchell testified that he rented the land to Holman for the year 1926. Holman did not say who rented it to him, nor did Hunt, who cultivated only five acres. The complainants, however, charge that Sherrell had possession and they seek to charge him for rents at $200 per year.

In Lieberman, Loveman & Cohn v. Knight, 153 Tenn., 268, 283 S. W., 450, it is said:

"While in theory the rule prevails in Tennessee that the mortgagee takes the legal title and is entitled to possession, in practice the doctrine is only applied when necessary to protect the mortgagee's security afforded by the estate. In no sense can it be said that the common-law rule in its strictness prevails here. By common law, estates which were conveyed subject to defeasance upon payment of a given sum, on a particular date, were held to be estates upon condition, and if the condition was broken, the estate became absolute in the grantee, because it was the principal fact, and the debt merely collateral. This principle applied equally to mortgages and deed of trust, intended as security for a debt, and providing for sale upon default in payment by the mortgagor. This rigorous rule has been modified in Tennessee, so that the debt becomes the principal fact, and the estate mortgaged to secure the debt merely collateral. Hickman v. Cantrell, 9 Yerg., 172, 30 Am. Dec., 396."

"The title that passes to the mortgagee where the mortgagor remains in possession is a potential right to protect the estate from impairment of the security to such extent as would defeat payment of the debt secured. In the exercise of this right the mortgagee can restrain waste by the mortgagor or a third person. He can sue and recover damages for acts done to the estate which impair the security afforded by it, and can follow things

severed from the estate and recover "their value if the severance impaired the security. But, in order to justify his recovery in any event, it must appear that he has suffered in consequence of the injury to the estate covered by the mortgage."

If Mitchell abandoned the premises, Sherrell was justified in taking possession in order to protect his security. If Mitchell rented to Holman and Sherrell took possession, it nevertheless appears that no rents were collected until after the foreclosure. If that foreclosure was valid the deed passed title to the crops (out of which came what rents were received) to the purchaser. Langford v. Hudson, 146 Tenn., 309, 241 S. W., 393.

The improvements on the land were damaged, and there is evidence that this damage amounted to $100 to $150. But there is no proof whether this damage occurred before or after the sale. Mitchell left the place before the beginning of the year 1926. Sherrell did not take possession until the following springtime. There is no evidence that Sherrell knew of or consented to the waste. It is most unlikely that he would have allowed his security to be thus impaired. A claim for damages could not be sustained upon such evidence.

As to the claim of inadequacy of price, there is, in the first place, a contrariety of testimony as to the value of the property. It was assessed for taxation at $600. Of course, we may know judicially that this was not its full value. The mortgage provided that if the power of sale should be exercised, the sale should be made for cash. We find that the land lies on what is locally known as Pea Ridge, a section frequently referred to as "the barrens," and is in the 18th Civil District of Lincoln County, Tennessee, and contains about 65 acres. It is not located on any improved road, but located on a "by-road back through the barrens there." About 28 acres of the tract is in cultivation, and there is scarcely any timber on the uncleared portion, and a portion of the place is swampy, and most of the land on the place is low and inclined to be boggy. The buildings on the place consisted of the one three-room box house, not in good condition, and a "hull of a barn," something like 30 feet square, and it seems that there was also a sort of a shed used as a garage. Only a small portion of the place was under fence, and what fence was there was in bad repair. The place has a good well on it, and there are four or five peach trees, and possibly four or five apple trees.

John Mitchell, the complainant, testified that it was worth from $1500 to $2000. A witness, Rainey, said that it was worth the same, but he admitted that while he had been around the land, he had never been over it, and had been only on a part of it. He did not know what was the rental value of it. A witness, Jones, said that it was

worth the same, but he did not know how much of the land was cleared and his opinion was based "on the way lands have been selling down there." A witness Colbert, on the same basis and having about the same knowledge, testified that it was worth $2000. These witnesses were not asked what the land was worth if sold at auction for cash. On the other hand, the defendants introduced witnesses who were asked what was the fair cash value at forced sale. Esq. Twitty, a farmer living about a mile from the land, long familiar with this land and with land values in that community was asked and answered as follows:—

"Q. In your opinion, what would be a fair cash valuation for this 65-acre tract or parcel of land, if sold for cash? A. Well, now, in my opinion, taking the location and everything in consideration, the cash valuation, if you could find a man who would buy it at all, I would say $1000 or $1200.

"Q. As T understand from your answer, you think it would be very difficult to sell it for cash at all? A. I would think so, yes sir.

"Q. In other words, if I catch you, Esq., a man that would give $1,000 or $1200 in cash usually is not going to buy that sort of a place cut off from the road? A. Yes, sir, he wants it on the road, if he is able to pay cash for a farm."

Esq. Twitty further testified that he knew of sales being made in that vicinity at anywhere from $10 to $50 per acre, according to the improvements and location, and that the nearest land he knew of to the tract in dispute, which had been sold, was the McLemore lands, which were sold on terms, and realized only $10 per acre.

Gordon Holman, a tenant and debtor to Sherrell, having cultivated this land for more than one year, testified that in his opinion $800 to $1000 would be all that it was worth if sold for cash; that it would bring more if it were located on a good road leading to the place from the main road, but the condition of the road was such as to depreciate the value of the farm.

Mr. Sherrell testified that he was not sufficiently familiar with the value of lands in that community to state an exact value, but that he preferred to have his debt paid to having the land at that time.

The sale was made at the most favorable season for selling farm lands. It was made at the time and place specified and at public outcry by an auctioneer. There is no evidence of fraud or collusion —unless the proof shows such inequality between the price given and the real value of the property, so strong and manifest as to shock the conscience and confound the judgment of any man of common sense, amounting to fraud. Meath v. Porter, 9 Heisk., 224. In that case it was said:

"From the cases it can be clearly gathered that "courts, in cases of gross inadequacy of price and great hardship, readily seize upon any circumstance of surprise or undue advantage, or other inequitable circumstance, and bring it in aid of relief against such contracts."

The court also held that the trustee in an assignment is the agent of the grantor as well as the beneficiary, and must sell the property in a manner to command the best possible price. In that case the property was sold for one-fourth of the value in the absence of the debtor without fault.

In Stewart v. Hamilton Building & Loan Ass'n, 47 S. W., 1106, a sale under a deed of trust was set aside for fraud because it was purposely advertised in an obscure weekly paper and the property was bid in by the holder of the debt at one-third its value.

In Fenton v. Bell, 53 S. W., 984, the bill charging that the beneficiary in a trust deed purchased the property for one-seventh its value; that the maker was not present at the sale, knew nothing of it, and did not even know that the trustee had accepted the trust,— it was held that the complainant would be entitled to set the sale aside for inadequacy of consideration.

In Wright v. Wilson, 2 Yerg., 294, a sale of land by a trustee, under a deed for the benefit of creditors, although made in conformity with the provisions of the trust deed, was set aside where the secured creditor was the purchaser and the land, which was worth $500, sold for only $50.

In Donoho v. Bales, 59 S. W., 409, a sale under a mortgage was set aside for inadequacy of price where the property was worth from $300 to $400 and it was sold for only $50.

These are all the reported cases in Tennessee, in which sales under mortgages or deeds of trust were set aside for inadequacy of price. The general rule is that mere inadequacy of price does not in itself invalidate or affect the sale, otherwise properly conducted, unless it is so great as to shock the conscience of the court; and a court will be particularly inclined to set the sale aside when in addition to inadequacy of price other circumstances exist rendering it inequitable for the sale to stand. 19 R. C. L., 615; 41 C. J., 1026. Esq. Twitty's estimate of the value of this land involved may be interpreted as being as much as $1200. Two disinterested white farmers thought that the land was worth $1500 to $2000, although they were not thoroughly familiar with it. It may be fairly inferred that the land was worth twice what it sold for.

It is clear that Mr. Sherrell made no effort to obtain bidders other than to have the notices posted in that remote district and have the sale conducted at public outcry in Fayetteville. He made no effort

to protect the interest of the mortgagor. It appears that Mitchell was living at Fayetteville at that time and had no knowledge of the sale. We do not hold that actual notice to him was necessary, but we take into consideration his want of knowledge as tending to show that the sale went by default.

In view of these facts and in view of the provisions inserted in the mortgage by the mortgagee for a sale many miles away from the land without notice to be posted at the place of sale, we think that the mortgagor was not fairly treated and that the sale should be set aside. What we mean to say is that in view of all these facts there was upon the mortgagee a duty to exercise a higher than ordinary degree of care and diligence to obtain bidders, to obtain as large a price as he reasonably could, and he made no effort to this end. 41 C. J., 1029; 19 R. C. L., 593; Meath v. Porter, supra; Wiltsie on Mortgage Foreclosure, sec. 832, and cases cited. Because sales by mortgagees under powers are much liable to abuse, they are most jealously watched by courts of equity, and upon slight proof of unfair conduct they will be set aside. Reisenberg v. Hankins (Tex. Civ. App.), 258 S. W., 904; Pearson v. Gooch, 69 N. H., 208, 40 Atl., 390; Atkins v. Crumpler, 118 N. C., 532, 24 S. E., 367. The very purpose of a stipulation in a mortgage or deed of trust for a public sale and the publishing of notices thereof is to secure the attendance of purchasers and obtain a fair price for the property. Hoffman v. Anthony, 6 R. I., 282, 75 Am. Dec., 701; See also Givens v. McCray, 196 Mo., 306, 93 S. W., 374, 113 Am. St. Rep., 736.

We think that equity requires that this sale be set aside and that a resale should be made. Of course, the land may not bring more at another sale, but it will be made in a manner and under circumstances that will be entirely fair to the mortgagor. The decree of the Chancery Court is therefore reversed and the cause will be remanded to that court with directions that a reference be made to determine what is the present indebtedness of the complainant Mitchell to defendants after deducting the fair rental value of the land, less taxes and other necessary expenses, for the time of possession by defendant Sherrell; that the land be then sold under orders of the court for cash and in bar of the equity of redemption, for the satisfaction of the debt so found. The costs of the appeal will be adjudged against the defendants. The costs in the chancery court will abide the final decree of that court.

Faw, P. J., and Crownover, J., concur.